Haywood, J.
The declaration states a bill single drawn by Balch, payable to Whitesides, who indorsed to Bell, and he, by his attorney, Whitesides, to Perkins, to he paid ninety days after the 29th of May, 1819, or in other words, on the 30th of August, allowing for the *209 three days of grace. Oil the 30th of August it was presented to Balch for payment, who failed to pay. Non assumpsit was pleaded by Bell, and there was a verdict and judgment for the plaintiff, and an appeal to this Court in the nature of a writ of error. The bill of exceptions states that the plaintiff offered to read a protest to prove a demand and notice to the indorser, Bell, and Jacob Perkins, to prove that the notary was dead and was in the habit of serving notices on indorsers; all which was objected to, but the testimony was admitted. . The proof was that Bell lived six or eight miles from Charlotte, and that Perkins, the notary who is now dead, always directed notices of protest against the defendant to him near Charlotte, Dickson County, Tennessee. This note was protested on Monday, the 30th of August. The mail left Nashville for Charlotte on Tuesday in every week, and a letter put into the mail on Wednesday would reach Charlotte nearly a week later than if put in on Tuesday. Jacob Perkins said it was the habit of vhis father to make out the protest the same evening the note was dishonored, and to send notice the first mail after the day of protest, when the indorser lived out of town, directed to the nearest post-office to which the indorser lived. The defendant in error, Perkins, read from the book kept by the notary, Perkins, in his lifetime a marginal note made opposite to the counterpart or copy of this very protest, and wrote in these words, “ indorser duly notified in writing September 1st, 1821.” On a former occasion, not being apprised of the late decision of the Supreme Court of the United States, and examining the question on British authorities, 1 Salk. 285, 15 C. 32, 3 Campbell, 305, 377, they seemed to result in this conclusion, that an entry made by one who has peculiar means of knowing the fact, and who, if living, could be a witness to prove it, shall be received as secondary evidence after his death, if fortified with the presumption in favor of its veracity by the circumstance that such entry either charged the maker of it, or discharged some person who, but for the entry, would be liable to him. And as the entry made in that case upon the books of the dead notary neither charged himself nor were prejudicial to him, that it was therefore without the mark which gives to it the capacity of being considered as evidence. But since that time we have been furnished with a decision lately made in the Supreme Court of the United States, in the case of Nichols and Wébb, 8 Wheat. 326, which, in my apprehension, makes it a duty to conform our judicial opinions to it, in all the instances that are clearly within its scope; otherwise, upon a subject in which all the States are interested, one rule might prevail in one State, another in the second, and in the third another, and instead of equal benefits extended to all the citizens of the Union, some of them must necessarily suffer by remedies of a more confined operation than others, to the influence of which they might be subjected in other parts of it; the natural tendencies of which differences must be disgust^and alienation from the government, besides the *210 injustice and wrong to individuals. The rules, therefore, adopted by the Supreme Court should be followed by all, when made upon a general subject which affects the whole. The facts upon which the Supreme Court decided were, “ that Perkins, the notary, who is now dead, and who was the father of the witness, Sophia Perkins, kept a regular record of his notarial acts, and uniformly entered in a book kept by himself, or caused the deponent to do it, exact copies of the notes, bills, &c., and in the margin, opposite to the copy of the protest, made memorandums after notification to the indorsers, if any, of the fact of such notification and the manner. And that his notarial record had been ever since his death in the house where she lived.” And to her deposition she annexed and verified as true, a copy of the protest in the case. The copy of the protest states the demand and the day, and a memorandum in the margin, “ duly notified in writing, 19th July, 1819, the last day of grace being Sunday, the 18th : W. Perkins.” The same objection lay to the generality of the marginal note as here, for not specifying the facts upon which the entry of due notification was made, so that the Court might judge whether he was warranted in the assertion that the in-dorser was duly notified. It did not prevail there, because possibly that was the best evidence then extant, and ought to be submitted to the jury, who possibly might infer the necessary fact which it tended to prove, rather than by excluding the testimony to destroy the fact inevitably, though it might really exist. And now we ought to consider the same entry capable of proving the same facts which it was then deemed competent to prove, if the jury thought proper to believe the fact which it tended to establish, namely, that he either gave notice personally or by the mail, which went on the next succeeding day after the demand made, to the post-office nearest the place of residence of the indorser. By the decision in Webb and Nichols, the first of September may be taken to be the day on which the notice was given, as there the first of July was taken to be the day of notice, or it might be by a written communication lodged in the post-office on that day, to be sent by the next mail, which would have been too late; or it might be by personal notice served on that day, which would have been good, or by mail on 31st, though the entry was not made till the first of September. It was competent to be given to the jury because, if taken by them in either of two ways, it proved a good notice, and they were the judges to determine whether it proved that more than the other. Certainly we have further matter to determine, which the Supreme Court had not, whether there ought to be a new trial for the insufficiency of the evidence to support the verdict. The rule we are governed by on the subject is, not to grant a new trial unless the facts proved be grossly inadequate to that end, and here we cannot say so, taking into view the testimony of Jacob Perkins, who says it was the habit of his father to make out the protest the same evening the note was dishonored, and to send notice by *211 the first mail after the protest. We cannot discover that the jury were unfounded in believing in testimony that the notice was sent in the mail on the 31st, though the entry of its transmission was not made till the first of September, or that it was given personally on the first of September. This testimony of the son is not to be rejected as incompetent, because it is of the same species and receivable upon the same principles as was the evidence of the notary in the case of Miller and Hackly, 5 Johnston, 375 ; and as was the evidence in the case cited from Campbell, 3 Campbell, 305, 379. In both cases the fact is not proved directly, but inferred from circumstances which induced a presumption of the fact. It is therefore impossible to say that the evidence is palpably insufficient for the support of the verdict.
Is the entry of “ duly notified,” which was before the Supreme Court, different in point of respectability and credit from the entry in the same words which is before us ? There it was read from the books of the notary, in which he recorded his notarial acts, or caused them to be recorded by his daughter, which books had been in the house where she lived ever since his death. Here was read from the book kept by Washington Perkins in his lifetime, a marginal note made opposite to' the copy of this very protest and note “ duly notified in writing.” The identity of the books is recognized in the latter instance, but in the former was proved by the circumstances deposed to. There is no substantial difference between them. The testimony, it must be admitted, is imperfect and unspecific, and capable only of raising probability, to which the jury may give the weight they think it merits. It is not received as primary and direct evidence, but only as secondary, for want of the primary and better evidence which, by the death of the notary, is now unattainable. And it is received, not because of any innate mark of veracity, such as is relied upon by the British cases before cited, but upon a quite different principle, the prevention of a great public inconvenience, by the loss of facts upon which depend the rights of individuals, which must perish if those facts become extinct. The general modern custom to make demand and to give notice by notaries, is the origin of this necessity, and produces this dilemma, that either the debts dependent upon this testimony be lost, or this new species of evidence must be admitted to prove as much as it can. The Court has chosen the lesser of two evils, and has proceeded on grounds similar to those upon which entries made by a merchant’s clerk who is dead, are admissible; the only difference being that here is a more urgent and public necessity than in the case of the merchant’s clerk. The reason, however, of its reception, points out and limits its extent. Being secondary, it is not to be received where the primary may be obtained. The notary, for instance, being still living who made the entry, or the entry having been made upon the information of a person still living, .or indeed of any person but the notary himself; for in any of these cases secondary testimony is not the best which it is in the *212 power of the party- to produce, and therefore he is not allowed to produce it at all. Supposing the evidence not to be admissible by the rules of common law, then it is apprehended by one of the counsel that an attempt will be made to bring this case within the provisions of the Act of 1820, ch. 25, and his opinion is that if it be covered by that law the same is unconstitutional, being a retrospective law. That position the learned counsel endeavored to maintain in a former argument, which was made by him with great ingenuity, and with as much force as it was possible to apply. The position cannot be supported.
It is most perfectly correct, so far as it regards the construction of laws, that a retrospective operation shall not be given to them, unless the manifest meaning of the law be that it should have such operation ; but where such meaning is plain, the will of the Legislature should be conformed to in fixing the construction. When it is once determined that the law is manifestly retrospective, then, and not before, arises the question whether it be repugnant to the Constitution or not. Upon this point it might be sufficient to refer to two adjudicated cases, one in Overton’s Reports, the other in the late opinion upon the indorsement laws; for these ought to settle the controversy, unless palpably erroneous, and then they ought to be rejected, as was done in the case of appeals from orders for roads, and - from a practice in equity which had been established for several years, at Knoxville two or three terms ago, and in several instances in modern times; but quitting hold upon these, and briefly considering the point upon principle, the result must be the same. Article 11, § 20, of the Constitution says, “that no retrospective law, or law impairing' the obligation of contracts, shall be made.” Does it mean all retrospective laws in general, or only some of a particular description, and if the latter, of what particular description ? Not retrospective laws in general, for then no law could be made for the remuneration of past services, not even the members of Assembly, their clerks and doorkeepers, at the end of each session of Assembly. Nor could further time be given for the probate and registration of deeds, of which there never was any doubt from the first Assembly after the formation of the Constitution to this day. Such probates and registrations have been sanctioned in a thousand instances by our courts of justice. Nor can it mean laws made for the preservation and establishment of just rights and titles, which have become imperfect and infirm by the non-observance of some legal ceremony ; for these laws are not to take away rights, but to confirm and establish them.
Laws for providing easier modes for proving deeds; for rewarding past services ; for amending mistakes in grants and deeds ; for. giving verdicts in evidence instead of judgments; for legalizing marriages made under the -Franklin government, administrations under the same government, and judgments and sales under its authority;’ and acts of limitation suspended *213 during the time a war lasted; in such instances, the law is retrospective, but not unconstitutional, because, not such retrospective laws as this article of the Constitution prohibits. There are some retrospective laws which it does prohibit; ex post facto laws, for instance, and laws impairing the obligation of contracts; these are justly prohibited, because they destroy existing rights, not preserve them from destruction. If there be any other such laws, which the Constitution prohibits, time and future emergencies will bring them to light; but to say in general all retrospective laws are void, is to introduce at one breath all the disorders which have been suppressed by the acts before mentioned, and by many others which are not at present particularly remembered; and to wrest from the Legislature a power which has been hitherto exercised to the great benefit of the community and for which, in various instances, complete and perfect justice could not be procured without the use of such laws, and is what this court, in my judgment, have not the right, and should not have the wish to do. Whenever a legal right did once exist, and is likely to be lost by some accident, omission, or imperfection, an act of the Legislature may be interposed to prevent the loss, and to give stability to such rights. In such case no one is deprived of his property, but on the contrary loss of property is obviated, and just and equitable rights which conscience sanctions are preserved. This the Constitution does not prohibit, constant usage justifies, and conscience requires. Far otherwise would it be, if a contract were violated, or the property of one man taken and given to another.
The conclusion to be drawn from the foregoing premises is this; that the books and protest, and copy of the bill single, marginal notes, and the evidence of Jacob Perkins, were all properly received,- and that no such gross misconstructions made by the jury were perceptible, as would justify this Court in setting aside the verdict. And the judgment ought to be affirmed.
Whyte, J. was of a contrary opinion on all the points.
Brown, J. took time to advise.